DAVID T. KYNER et al.

v.

PHILIP BOLL.

*Opinion filed October 13, 1899.*

| 182 | 1̄7̄1̄ |
|-----|------|
| 192 | ¹257 |
| d192 | ²261 |
| j192 | ²265 |
| 182 | 171 |
| ¹199 | ¹470 |
| 199 | ¹471 |
| ¹182 | 171 |
| ²202 | ¹285 |

1. ENTAILS—*Conveyance act changes effect of a deed creating an estate in fee tail.* A conveyance to a grantee and her "bodily heirs" and assigns creates an estate in fee tail general at common law, but, since the abolition of estates tail, passes, under section 6 of the Conveyance act, (Rev. Stat. 1874, p. 273,) an estate for the grantee's natural life only, with the remainder in fee simple absolute to the persons to whom the estate tail would, on the death of the grantee, first pass at common law.

2. DEEDS—*when equity may correct deed containing a mistake of law.* Equity will not refuse to correct a deed on the ground that the error is a mistake of law, where the scrivener, from ignorant presumption, has inserted in the deed words limiting the estate of the grantee contrary to the intention of the parties, who, upon discovering the mistake and before any estoppel in favor of third parties had arisen, attempted to correct it by a second deed omitting such words. (*Fowler* v. *Black*, 136 Ill. 363, distinguished.)

3. SAME—*what evidence competent in suit to reform deed.* In a suit to reform a deed, testimony as to what was said as to the necessity of a new deed when that executed and recorded was brought back to the scrivener who drew it, is admissible, as part of the *res gestæ*, on the question as to the reason and purpose of a second deed.

4. SAME—*when reformation of deed is not dangerous to stability of titles.* It is not dangerous to the stability of titles to real property to correct deeds upon parol evidence after the lapse of many years, when such evidence, taken in connection with subsequent deeds, tends to sustain a title, or at least the equitable right to it, which all parties have recognized and acted upon for many years.

APPEAL from the Circuit Court of Christian county; the Hon. WILLIAM M. FARMER, Judge, presiding.

NOBLE & SHIELDS, JAMES B. RICKS, and WILSON & WARREN, for appellants:

To justify a reformation of a written instrument upon the ground of mistake, the alleged mistake must, first, be one of fact and not of law; second, such mistake must be proved by clear and entirely satisfactory evidence, as

a mere preponderance of evidence is not sufficient; third, the mistake must be mutual and common to both parties to instrument. *Gordere* v. *Downing,* 18 Ill. 492; *Wood* v. *Price,* 46 id. 439; *Sibert* v. *McAvoy,* 15 id. 106; *Emery* v. *Mohler,* 69 id. 221; *Beebe* v. *Swartwout,* 3 Gilm. 162; *Fowler* v. *Black,* 136 U. S. 363; *Purvines* v. *Harrison,* 151 Ill. 219; *Ruffner* v. *McConnell,* 17 id. 212; *Oswald* v. *Sproehnle,* 16 Ill. App. 368; *Dinwiddie* v. *Self,* 145 Ill. 290; *Fowler* v. *Black,* 136 id. 363.

The evidence must be strong and most convincing. *Hunter* v. *Bilyeu,* 30 Ill. 228; *Cleary* v. *Babcock,* 41 id. 271; *McDonald* v. *Starkey,* 42 id. 442; *Ford* v. *Joyce,* 78 N. Y. 618; *Lord Ineham* v. *Child,* 1 Brown's C. C. 92.

Both parties to the original instrument must have labored under a reciprocal mistake common to both, and both must have had the same misconception in respect to the terms of the deed. *Page* v. *Higgins,* 150 Mass. 57; Story's Eq. Jur. chap. 155.

When the mistake is not as to the contents of the deed, but as to their effect, a court of equity will not correct it. A mistake of fact only will be reformed in equity. So if the word "heirs" is used in a deed by mistake for the word "children," it will not justify a reformation of a deed. (*Fowler* v. *Black,* 136 Ill. 363.) So in the present case, if the words "bodily heirs" were used by mistake for the word "heirs" it will not justify the decree rendered in the lower court.

A written instrument, carefully and deliberately prepared and executed, is evidence of the highest character, and will be presumed to express the intention of the parties to it until the contrary appears in the most satisfactory manner. 2 Beach on Modern Eq. Jur. sec. 546.

The deed in the present case was infinitely better evidence of the intention and meaning of the parties than all the evidence adduced. *Adams* v. *Robertson,* 37 Ill. 45; *King* v. *Isly,* 116 Mo. 155.

The declaration of the grantor will not be received to impeach or discredit his own grant or deed. *Williams* v.

*Evans,* 154 Ill. 98; *Dickie* v. *Carter,* 42 id. 376; *Guild* v. *Hull,* 127 id. 523; *Massey* v. *Huntington,* 118 id. 80; *Hart* v. *Randolph,* 142 id. 521; *Higgins* v. *White,* 118 id. 619; *McGinnis* v. *Jacobs,* 147 id. 24; *Francis* v. *Wilkinson,* id. 370; *Bevelot* v. *Lestrade,* 153 id. 625.

A deed will not be reformed by a decree of court so as to make it express something entirely different from what is written on its face, except upon evidence of the clearest and most satisfactory character, such as to leave no fair and reasonable doubt upon the mind as to the intention of the parties. *Harrison* v. *Sullivan,* 11 Ill. App. 423; *Warrick* v. *Smith,* 36 id. 619; 137 Ill. 504; *Dinwiddie* v. *Self,* 145 id. 304.

J. C. McBride, and W. M. Provine, for appellee:

If a written agreement fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing. Among the ordinary examples of such errors are those as to the legal effect of a description of the subject matter and the import of technical words and phrases. But the rule is not confined to those instances. *Dinwiddie* v. *Self,* 145 Ill. 290.

Courts of equity are not limited to affording relief only in case of mistake of fact, but a mistake in the legal effect of a description in a deed, or in the use of technical language, may be relieved against upon proper proofs. 1 Beach's Eq. Jur. sec. 41, and note, and secs. 35-41; 2 id. secs. 538-552; *Purvines* v. *Harrison,* 151 Ill. 219; *McLennan* v. *Johnston,* 60 id. 306; *Hunter* v. *Bilyeu,* 30 id. 228; *Canedy* v. *Marcy,* 13 Gray, 373.

A mistake in a deed may be shown by parol evidence. This exception rests upon the highest motives of policy and expediency, for otherwise an injured party would generally be without a remedy. Even the Statute of

Frauds cannot, by shutting out parol evidence, be converted into an instrument of fraud or wrong. 1 Story's Eq. Jur. sec. 155, *et seq.;* 2 Pomeroy's Eq. Jur. sec. 858.

Courts of equity will grant relief in cases of mistake in written contracts, not only when the mistake is expressly established, but also when it is fairly implied from the nature of the transaction. 1 Story's Eq. Jur. sec. 162.

The exception to the general rule of evidence as to hearsay testimony is, that where the declarant is deceased, and where it appears that he possessed competent knowledge of the facts, and that his declarations were at variance with his interest, they are admissible in a suit between third persons, and such declarations need not be in writing. 1 Phillips on Evidence, p. 244, note 102; *White* v. *Chouteau,* 10 Barb. 202; Underhill on Evidence, sec. 66; 1 Greenleaf on Evidence, sec. 149.

The declarations of a party in possession of land, as to the character of his title, are receivable in evidence as part of the *res gestœ,* in favor of the party who derived title from him. 1 Phillips on Evidence, sec. 195, note; *Youngs* v. *Vredenburg,* 1 Johns. 158; 9 Am. & Eng. Ency. of Law, 315.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellee, Philip Boll, brought his bill in equity in the Christian circuit court against the appellants, David T. Kyner, Arthur L. Kyner, Mary Kyner Vinson, Annie Kyner Buck and Eva Kyner Windmuller, to reform and correct a deed of conveyance in his chain of title to the northwest quarter of section 5, township 14, north, range 1, west of the third principal meridian, in said county, and to enjoin the prosecution of an action of ejectment then pending against him, brought by all of the defendants except David T. Kyner. This appeal is from the decree entered in accordance with the prayer of the bill.

On October 20, 1862, Thomas Welch, the then owner of the land, and Lucinda, his wife, who were without chil-

dren of their own, by their deed of general warranty conveyed the land to their adopted daughter, Jennie, then recently married to said David T. Kyner. The deed was in consideration of love and affection and one dollar, and granted the premises "unto the said Jennie Kyner, bodily heirs and assigns;" *habendum* to "the said Jennie Kyner, her bodily heirs and assigns;" covenant with "the said Jennie Kyner, her heirs and assigns," of legal seizin in fee, etc., of the premises, and that the grantors had good right to convey the same to "said Jennie Kyner and her bodily heirs," and that "they will warrant and defend the same to said Jennie Kyner, her bodily heirs and assigns forever," etc. The deed also contained this clause: "And the said Thomas Welch and Lucinda Welch retains the support out of said land during their lifetimes." This was the deed reformed and corrected by the decree by striking out the word "bodily" wherever it occurred.

The evidence showed that July 18, 1863, a child, Eugene Kyner, was born to Jennie Kyner of her said marriage, and lived until July 28, 1864, when it died, leaving her childless at that time. For some reason, concerning which there is much controversy, Thomas Welch and his wife made and delivered to said Jennie Kyner another deed of general warranty, dated February 3, 1865. At this time Jennie Kyner was childless, but the appellant Mary, the oldest child now surviving, was then *en ventre sa mere* and was born June 22, 1865. This, the second deed, was in all substantial respects the same as the first, except that the word "bodily" was left out, and the support retained in the first deed was in the second covenanted for in these words: "And in consideration of said conveyance said Jennie Kyner, with her husband, David T. Kyner, agrees to support said Thomas Welch and Lucinda Welch during their natural lives and the lives of each of them." The first deed was acknowledged October 20, 1862, before William E. Pettis, a justice of the peace, and was filed for record November 25, 1862, and the sec-

ond deed was acknowledged February 20, 1865, before Henry Bloxam, justice of the peace, and filed for record April 2, or else April 12, 1865. The Kyners went into possession of the land, the precise date not appearing, but David T. Kyner testified that he began to break and improve the land in 1863, and afterwards built a small house upon it, put a hedge around it and put it in cultivation. In 1882 he negotiated a sale of it to appellee, Boll, for its then full value, $6885, representing to Boll at the time that the title was all right, and he and his wife, Jennie Kyner, by their deed of general warranty dated November 24, 1882, conveyed the premises to Boll, Boll paying in cash all of the purchase money except $4000, and securing that amount by a mortgage to Kyner on the property, which was two years afterward paid off by Boll and canceled by Kyner. Upon receiving this conveyance Boll took possession of the property and improved it, until at the time this suit was commenced it was of the value of $10,000. Jennie Kyner died August 29, 1890, at the age of forty-six years, leaving surviving her her husband, David T. Kyner, and the four other appellants, her children. The suit in ejectment by said four appellants against Boll was not commenced until July 16, 1896.

By the first deed Jennie Kyner would have taken an estate in the land, which at common law, or rather after the enactment of the statute *de donis*, would have been an estate in fee tail general, such being the effect of the words "bodily heirs" upon the title; but by the sixth section of chapter 23 of the Revised Statutes of 1845, which was in force when the deed was made, and which is now section 6 of chapter 30 of the Revised Statutes of 1874, estates tail are abolished and the first grantee is seized as for her natural life only, and the remainder passes in fee simple absolute to the persons to whom the estate tail would on the death of the grantee in tail first pass according to the course of the common law. (*Dinwiddie*

v. *Self*, 145 Ill. 290.) Such was the proper construction of the first deed as drawn. When the first child, Eugene, was born, he took, as the deed read, an estate in fee simple in the land, subject to the life estate of his mother, Jennie Kyner, and subject also to be opened to let in after-born children of his mother, who would become tenants in common of the fee with him. (*Frazer* v. *Supervisors of Peoria County*, 74 Ill. 282; *Lewis* v. *Pleasants*, 143 id. 271; *Voris* v. *Sloan*, 68 id. 588.) When the child Eugene died before the birth of another child, such fee so vested in him passed to his heirs-at-law, who were his father and mother, subject to be divested *pro tanto* to let in after-born children. It is plain, therefore, that, if the first deed controlled the title according to its terms, David T. Kyner and Jennie Kyner, when they conveyed to Boll, were, subject to the life estate in Jennie Kyner, the owners in fee of an undivided one-fifth of the land, and the other appellants, their children, were the owners of the other four-fifths. This effect, as above stated, of the first deed, if not reformed as the product of a mistake, is conceded by the appellee by his bill to enjoin the ejectment suit and to correct the alleged mistake by striking out of the deed the word "bodily" wherever it occurs.

John Armstrong, a witness for the complainant, testified that in 1864-65 he lived in the neighborhood where the Welches and Kyners resided, and was well acquainted with them, and with Bloxam and Pettis, the two justices of the peace; that Bloxam and Pettis and Welch died several years before this suit was brought; that in the winter of 1864-65 he was in Pettis' office, where Pettis was writing a bond for him, when Bloxam and Thomas Welch came in together, and Bloxam presented a deed to Pettis and asked why he put the word "bodily" in there; that it should not be in there; that it was not Mr. Welch's intention and that he wanted it changed, and that was their object there at that time; that Mr. Welch also said it was his intention to make Mrs. Kyner a deed so she

could do what she pleased with the property; that Pettis replied that the word "bodily" had no meaning in the deed—that any heirs were bodily heirs; that Bloxam and Pettis had quite a dispute about it, and that Bloxam said there would be another deed made to correct that one, and Pettis replied that if they made a dozen deeds they would be of no account,—that they could make but one. The second deed was made soon after this conversation, and was acknowledged before Bloxam. This witness testified also that he saw the deed which Bloxam had brought in, and thought it was in Pettis' handwriting, which he knew well. The complainant produced other witnesses, who testified that while Thomas Welch was the owner of the land they heard him say that he intended to give it to his adopted daughter, Jennie Kyner; that all he wanted was his support, and that he was not afraid that Dr. Kyner and Jennie would not keep him. Welch had but little, if any, other property, and the confidence he expressed in Dr. Kyner, in connection with the other reliable evidence in the record, does not tend to prove that he had any desire or intention to convey the property in such a way as to put it beyond the control and disposition of his adopted daughter and her husband. The land was unimproved prairie land, and required much labor and the expenditure of considerable money to convert it into a cultivated farm, and the testimony of Dr. Kyner shows that they were unwilling to make such expenditure with the title in the condition it was left in by the deed of 1862. True, he did not testify that any mistake was made in drawing that deed, but to the contrary, and that their dissatisfaction was with the possibility of a reverter of the title to Welch or his heirs in case of a failure of issue of Jennie Kyner.

While we are of the opinion that, in the light of all the evidence in this case, it would be unsafe to base a judgment upon the testimony of Dr. Kyner, still it tends, in connection with other evidence, to show very strongly

that the first deed did not properly express the wishes
or intentions of the parties to it.   But whether or not
there was such a mistake in its preparation as to au-
thorize a court of equity to reform and correct it is a
much more serious question.   Ordinarily, after such a
lapse of time it would be unsafe to reform a deed upon
the testimony of witnesses based upon their recollection
of events and conversations occurring so long before.
But in the case at bar it is proved beyond doubt that
both parties were dissatisfied with the first deed and
made an effort to put the title in fee in Jennie Kyner.
This, we think, aside from the testimony of witnesses, is
shown by the deed of general warranty of the Welches
made to her February 3, 1865, of the same property, which
omitted the word "bodily" and contained full covenants.
This deed was accepted, filed for record and acted up-
on by Jennie Kyner, and she thereafter, as well as her
husband, treated the property as her own, absolutely, in
every way,—even to the extent of selling and conveying
it for its full value, with full warranty of absolute title.
It is not, of course, meant to be said that the title fixed
by the first deed could be changed in this manner by the
second deed, but it is meant to be said that the execution,
delivery and acceptance of the second deed, and the sub-
sequent attitude of the parties toward the property and
its title, tend strongly to prove one of three propositions,
viz.:  First, that by mistake of the scrivener the word
"bodily" was inserted in the first deed against the inten-
tion of the parties; or, second, that they were mistaken
in the meaning and legal effect of the deed as so drawn;
or, third, that after the conveyance had been made, and
before the second deed, they changed their minds, and
desired to change the title and to enlarge the interest
therein in Jennie Kyner. ·

Dr. Kyner's testimony, if relied on, tends to establish
the third proposition.   He testified that he was present
when the first deed was drawn; that it was drawn by

Henry Bloxam, who "was counted a pretty good doctor and lawyer;" that Welch told Bloxam how he wanted it drawn, so that he and his wife would have their support out of it, and that Jennie should have a life estate in it but couldn't sell it, and he put in the words "bodily heirs" so the children would have it afterwards; that he "wanted it to her and her bodily heirs—*bodily heirs* was the expression." The acknowledgment of the deed was taken by William Pettis, a justice of the peace, and Kyner testified that Bloxam, who he said wrote the deed, was not then a justice, but that he went for Pettis to take the acknowledgment. It was afterward, however, made to appear that Bloxam was a justice of the peace at the time the deed was drawn, and Kyner then testified that the reason he did not take the acknowledgment was that Lucinda Welch had an antipathy to Bloxam, which lasted until after the deed of 1865 was acknowledged before him, but that she was so anxious to have the second deed drawn that she was willing to acknowledge it before anybody. The first deed was not produced on the hearing. Notice had been served on appellants to produce it, but Dr. Kyner testified that he delivered it to Boll with all the other papers when Boll purchased the land. Boll, however, testified that it was never delivered to him and that he never saw it, and that he never had any knowledge of it until objections were made to his title when he tried to borrow money by securing it with a mortgage on the land, in the fall of 1895. Notwithstanding Dr. Kyner testified that all of the papers were delivered by him to Boll, he, or some of the defendants, upon notice produced the deed of 1865, and it may well have appeared to the chancellor, who saw and heard the witnesses testify, that the defendants to the bill withheld from the evidence in the case the original deed of 1862, and thus prevented a definite determination, from the handwriting, of the question whether Bloxam or Pettis wrote that deed,—a question of considerable importance in determining the

ultimate question whether or not the scrivener, alleged to
have been Pettis, inserted by mistake the word "bodily,"
and, incidental thereto, of importance also in weighing
Kyner's testimony that he was present, saw Bloxam write
it and heard Welch's directions to Bloxam.

The effect of Dr. Kyner's testimony was that he knew
from the beginning that the first deed was so drawn as to
give to his wife only a life estate, with the remainder in
fee to her children; that in case she had no children the
title to the land would, on her death, revert to Welch or
his heirs, Jennie Kyner not being entitled to inherit from
Welch, and that it was this possibility of a reverter that
caused him and his wife to desire, and Welch to make,
the warranty deed of 1865,—that is, in case she should
die without children the title should pass to her heirs
and not to Welch's. This, he testified, was the only pur-
pose of that deed, and says that he went with Welch to
Springfield, and they so told the attorney who prepared
the deed. One serious weakness of this testimony is, that
all this, including the making and delivery of the second
deed, occurred after the birth of Eugene Kyner, who, as
the first deed was drawn, took the fee, as before pointed
out, and also after his death, and after the fee vested in
him had passed to Kyner and his wife, and when there
was no longer any possibility of a reverter. Besides, as
the appellant Mary Kyner Vinson, the next child, was
then *en ventre sa mere*, it would hardly seem that the fear
of dying without children and thereby losing the prop-
erty could have been so potent a factor in causing the
execution of the second deed as the desire to correct the
error in the first deed, and thereby to acquire, as their
subsequent conduct showed they supposed they would,
the full title to the property. Dr. Kyner testified also, in
effect, that although he knew that his children owned the
remainder in fee in the land, he sold the land to Boll for
its full value, and, with his wife, gave Boll a deed of gen-
eral warranty conveying it in fee to him and said nothing

to Boll about his children's interest.   He testified, also, that when Boll discovered, thirteen years after his purchase and five years after the death of Jennie Kyner and the vesting of the title in her children, that there was a defect in the title because of the first deed, and applied to him, Kyner, to procure quit-claim deeds from his children, he promised Boll he would do so, accepted pay from Boll for his services in that behalf, wrote a letter to his three daughters, who lived away, for Boll, to be enclosed by Boll to them, with money to pay the expense of obtaining the execution of the deeds, but secretly wrote to his children advising them not to sign the deeds, and set to work to obtain the land for them by procuring information from counsel as to their rights in the premises, and aided in the prosecution of this suit.  In view of these facts the learned chancellor in the court below could not, in passing upon the facts, have reasonably relied on Dr. Kyner's testimony as to what took place when the first deed was written, nor as to the object and purpose of the second deed.  At the time the discovery of the defect in the title was made Jennie Kyner had been dead five years, and her children, the appellants, were aged as follows:  Mary Kyner Vinson thirty years, Eva Kyner Windmuller twenty-seven years, Arthur Kyner twenty-four years and Anna Kyner Buck twenty-one years, and no claim of any interest had been made by any of them, or by Dr. Kyner on their behalf, notwithstanding the Statute of Limitations had nearly run against them.   It also appeared from the evidence that in 1872 Welch and wife made a quit-claim deed to Jennie Kyner to the land to enable Dr. Kyner to procure a loan on the same, and that he did procure such loan to the amount of $2500, his wife, Jennie Kyner, joining with him in the deed of trust securing the same.  R. H. Woodcock, a banker, testified that in February, 1896, Dr. Kyner, in a conversation with him, said that it was not the intention of Mr. Welch to make the deed to the Kyner heirs, but to make it to Jen-

nie Kyner, and that he made the second deed to put the
title in Jennie Kyner; that he never intended to make it
to the children, but that he made it all the same and that
their title was good.

It is clear to our minds that, notwithstanding the
legal effect of what was done when the first deed was
made may not have been what the grantors and grantees,
the Welches and the Kyners, supposed, still, after the
making of the second deed, in 1865, somewhat over three
years after the first deed was made, they rested in the
belief, and acted upon the assumption for many years,
that the full title to the property in fee was vested in
Jennie Kyner, subject to the covenant of Dr. and Jennie
Kyner to support and maintain the grantors. This cove-
nant appears to have been complied with until Mr. Welch
died, a few years before the property was conveyed to
Boll, and his widow a few years afterward. It is urged
by the appellants that the purpose of the second deed
was, first, to prevent, by estoppel, the estate from re-
verting to the collateral heirs of Thomas Welch upon a
possible failure of issue of Jennie Kyner; and second, to
release the land from a lien retained in the first deed for
their support, and to convert the interest released, into
a mere personal covenant of the grantee, Jennie Kyner,
and her husband. But, as we have seen, the remainder
at that time had already vested and no reverter was pos-
sible, and there was no testimony whatever that either
party desired or intended any change in the respect sec-
ondly above mentioned. Had they desired a mere per-
sonal obligation there would have been no necessity of
incorporating it in the deed. Nor does this theory fur-
nish any reason for leaving the word "bodily" out of the
second deed. Besides, if such was the object of the sec-
ond deed, we would expect to find the covenants limited
to such object, and not to find a warranty to Jennie Kyner
of a title which he had previously conveyed to her chil-
dren. That they considered they still had a lien on the

land for their support under the second deed is shown by their quit-claim deed, given in 1872, to clear the title for a loan to Dr. Kyner. We are satisfied from the evidence that the purpose of making the second deed was not to cut off the supposed possibility of a reverter to Welch's heirs, nor to change his lien for maintenance to a mere personal obligation. Nor would it be consistent with the evidence to conclude that the first deed was drawn in accordance with the intentions of the parties, and that the second deed was made because they had changed their minds and wished to change the title by vesting it in fee in Jennie Kyner.

There remains, then, but one of two conclusions,—the first and second propositions already mentioned,—that can be maintained, namely, that the word "bodily" was inserted in the first deed by the mistake of the scrivener, or that the mistake of the parties is such a one of law that it cannot be corrected by a court of equity, but by which they must abide.

Counsel for appellants insist that whatever view we may take of the case upon other points, the conclusion must be reached that if there was a mistake in the first deed it was a mistake of law and cannot be corrected, and refer us to *Fowler* v. *Black*, 136 Ill. 363, and cases there cited, as sustaining their contention. We think the case at bar may be distinguished from those cited, and that the principle announced by them should not be carried to the extent of refusing relief where the scrivener, from ignorant presumption and against the intention of the parties, has inserted in the deed words limiting the estate which the parties intended the grantee should take, and which mistake, though it be in the legal effect of the words so inserted, the parties, upon discovering it and before any estoppel could operate in favor of third persons, have attempted to correct by another deed in which such words are omitted. It is well settled that there are many exceptions to the rule that equity will not correct

mistakes of law. Some of these exceptions are referred to in *Dinwiddie* v. *Self*, 145 Ill. 290, where a decree was affirmed striking out of a deed the very same words limiting the grantee's title as are involved in this case. There, upon the verbal contract for the purchase of land and at the instance of the father of the grantee, and without her knowledge or authority, the grantor made the deed to her and her "bodily heirs." No such limitation had been agreed upon or mentioned between the parties to the deed, and we held that the deed was properly reformed by striking out the word "bodily" wherever it occurred in the deed. It was there, among other things, said, quoting from Pomeroy's Equity Jurisprudence (sec. 845): "If a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing. Among the ordinary examples of such errors are those as to the legal effect of a description of the subject matter and as to the import of technical words and phrases. But the rule is not confined to those instances." So, also, in *Canedy* v. *Marcy*, 13 Gray, (Mass.) 373, it was said by Chief Justice Shaw that "a mistake in the legal effect of a description or in the use of technical language may be relieved against, upon proper proof."

It is insisted, however, that the testimony of Armstrong was incompetent as to what took place and was said between Welch, Bloxam and Pettis when Bloxam brought back to Pettis the first deed, (the evidence showing sufficiently, we think, that it was the first deed, no other deed answering the description having been made between the parties,) and as to what was said relative to the necessity of a second deed. The only objection made at the time this testimony was given was that it was irrelevant and immaterial. It certainly was not liable to

this objection, but treating the question of the competency of this testimony as open for consideration here, we are of the opinion that it was properly received and considered by the chancellor in the decision of the case. The reasons for, and the purpose to be accomplished by, the making of the second deed were matters of controversy on the trial. The deed itself was far from explicit on these points, and as explanatory thereof the testimony was admissible as a part of the *res gestæ*. True, this deed did not itself convey the title, and could only be treated as an attempt on the part of the grantor and grantee to correct the first deed, or to put in solemn and permanent form, and of record in the chain of title, the evidence of their intention to convey the whole title to Jennie Kyner. We are of the opinion that the evidence in question tended to explain the purpose of this deed and was sufficiently connected therewith to be a part of the *res gestæ*. Thus it was said in *Lander* v. *People*, 104 Ill. 248: "It is a well settled principle in the law of evidence, that whenever it becomes important to show, upon the trial of a cause, the occurrence of any fact or event, it is competent and proper to also show any accompanying act, declaration or exclamation which relates to or is explanatory of such fact or event. Such acts, declarations or exclamations are known to the law as *res gestæ*." The second deed could not, of course, take away from appellants, who are the "bodily heirs" of Jennie Kyner, the title which the first deed, if uncorrected for mistake, conveyed to them. (See *Frazer* v. *Supervisors of Peoria County*, 74 Ill. 282.) But we regard it and the other evidence in the record sufficient to support the decree reforming the first deed.

We cannot regard as applicable to this case the argument that it is dangerous to the stability of titles to real property to correct deeds upon parol evidence after the lapse of so long a period of time, for here the parol evidence, in connection with the subsequent deeds, tends to

sustain a title, or at least the equitable right to it, which all parties recognized and acted upon for many years.

Other questions have been raised by counsel, but we regard them as insufficient to justify a reversal of the decree, and it will be affirmed.     *Decree affirmed.*